# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No. 12-10089-01-23 |
| | ) | |
| Jason Najera, Pedro Garcia, | ) | |
| Gonzalo Ramirez, Russell Worthey, | ) | |
| Anthony Wright, Joshua Flores, | ) | |
| Jesus Flores, Angel Cerda, | ) | |
| Juan Torres, Alfredo Beltran-Ruiz, | ) | |
| Donte Barnes, Jesus Sanchez, | ) | |
| Enrique Gobin, Alfonso | ) | |
| Banda-Hernandez, Andrew Gusman, | ) | |
| Eusebio Sierra-Medrano, Jayson | ) | |
| Vargas, Adam Flores, Fabian Neave, | ) | |
| Jesus Torres, Jose Neave, Hernan | ) | |
| Quezada, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This case comes before the court on the admissibility of certain statements made by alleged coconspirators. The court held hearings on February 13, 2013, to determine the admissibility of the statements. Shane Webb, a deputy sheriff, Jay Bice, a detective with the Dodge City police department, and James Nau, an agent with the Kansas Department of Revenue, testified as witnesses. The court explained to defendants present at the hearings[1] their rights to testify and/or call witnesses. After consulting with counsel, defendants declined to testify or call witnesses. Subsequent to the

---

[1] The following defendants were present at the hearing: Jason Najera, Pedro Garcia, Gonzalo Ramirez, Joshua Flores, Donte Barnes, Enrique Gobin, Alfonso Banda-Hernandez, Andrew Gusman, Jayson Vargas, Adam Flores, Fabian Neave and Jose Neave. The remaining defendants were not present because the statements are not going to be offered against them at trial or because they do not object to the admission of the statements.

hearings, defendants filed supplemental memoranda in objection to the admissibility of the statements.[2] (Docs. 526, 527, 528[3], 532, 533, 534, 537, 538, 539, 543). The government filed responses in support of the admissibility of the statements. (Docs. 540, 588).

## I. Facts and Procedural History

On April 16, 2012, the grand jury returned an indictment against 23 defendants. The indictment alleges 38 counts, including charges of violent crimes in aid of racketeering, conspiracy and felon in possession of a firearm. The indictment alleges that defendants were in a criminal organization, the Nortenos gang, whose members engaged in narcotics distribution and acts of violence involving murder and robbery. These crimes are alleged to have been committed in Dodge City, Kansas. The indictment further alleges that the racketeering conspiracy began in 2008 and continued through the date of the indictment.

Eight defendants are charged in count 1 with conspiracy to commit racketeering activities in violation of 18 U.S.C. § 1962(d). The RICO conspiracy alleged in count 1 occurred from 2008 through April 16, 2012. Counts 2, 8, 10, 15, 19, 24 and 28 charge VICAR conspiracies in violation of 18 U.S.C. § 1959. The remaining counts allege VICAR substantive offenses along with charges of possession of a firearm in furtherance of a crime of violence. The government seeks to introduce

---

[2] Defendant Juan Torres filed a motion to join defendant Angel Cerda's motion to exclude. (Doc. 534). The motion is denied as moot because the government has not offered any statements against Torres.

[3] Defendant Cerda moves to exclude co-conspirator statements offered against him. At this time, the government has not identified any statements it seeks to offer against Cerda. Therefore, Cerda's motion is denied, without prejudice.

15 statements concerning seven different events charged in the indictment.

**Statements 1a, 1b, 1c, 2a, 2b and 2c**

On June 8, 2009, a robbery occurred at 1005 Avenue E in Dodge City, Kansas.  Four to six individuals were armed and broke into the residence.  The victims in the home were from Guatemala.  Witnesses to the crime identified the following four defendants as the individuals who committed the robbery: Jesus Flores, Joshua Flores, Pedro Garcia and Gonzalo Ramirez.  During the robbery, Ramirez hit a victim on his head with a pistol and forced him into a room to look for money.  The Dodge City police department had seen similar crimes against victims from Guatemala.

A confidential witness informed police that prior to the robbery Jesus and Joshua Flores, Pedro Garcia and Gonzalo Ramirez were all at 1302 Avenue D, Garcia's residence.  Garcia or Ramirez made the statement "lets go look for a house." (Exh. 1, statement 2a).  The four defendants then left Garcia's residence on foot and walked south to the alley until they were behind 1005 Avenue E.  Ramirez looked in the back window and said "let's kick this one" or "let's do this house." (Exh. 1, statement 2b).  Defendants then went around to the front and robbed the victims.  All four defendants participated in the robbery and then returned to Garcia's residence to divide the money.  With the exception of Joshua Flores, the witness informed police that Jesus Flores, Pedro Garcia and Gonzalo Ramirez split the proceeds from the robbery.

There were other Nortenos gang members in Garcia's residence after the robbery, including defendants Anthony Wright and Russell

-3-

Worthey. Shortly after the robbery and while in Garcia's basement, Garcia or Ramirez said "let's go get some scraps." (Exh. 1, statement 1a). "Scraps" is a derogatory term towards a Surenos gang member, a rival gang to the Nortenos. Officer Webb testified that the statement meant that they were going to confront Surenos' gang members. Garcia and Ramirez then left the house with Wright and Worthey. The four defendants got into Wright's vehicle armed with firearms. While driving, Garcia told Wright to go east in order to avoid the cops in Dodge City who were in the area of the robbery. (Exh. 1, statement 2c).

Garcia, Ramirez, Wright and Worthey drove to a mobile home park at 201 E. McCarter in Dodge City. The area is located on the South side of Dodge City and is considered to be more likely to be lived in by Surenos gang members. They proceeded to lot number 24 where a group of individuals, Israel Peralta, Mariano Sorano, Faustino Peralta and Roberto Arco, were drinking alcohol. Ramirez and Garcia fired their weapons at the four individuals killing Israel Peralta. The four defendants fled in the vehicle and drove back to Garcia's residence. In the vehicle, Ramirez said to Garcia, "you really got that one." (Exh. 1, statement 1b). Garcia then told Wright and Worthey to "remember [that] you have kids." (Exh. 1, statement 1c). Wright informed deputy Webb that he interpreted Garcia's statement as a threat toward his family and an instruction to not say anything about the shooting.

**Statements 3 and 3a**

On March 15, 2011, a shooting occurred at 1705 Ave D in Dodge City. The victim, Reyes Delera Padilla, a Surenos gang member,

reported that a red Lincoln pulled up and an individual "threw up" Norteno gang signs. Padilla went inside his home to ensure the safety of his family. Padilla then left his home and observed the red Lincoln parked around the corner. At that time, Padilla heard a gunshot. Padilla got into his vehicle and rammed it into the red Lincoln to "mark it." Padilla then called his brother-in-law who immediately came to the Padilla's home. Padilla observed a tan Lincoln parked with two passengers approximately two houses down from his house. Padilla parked in the driveway which is located in the back alley. Padilla and his brother-in-law were on the south side of the house when Padilla observed an individual a couple of houses away, saw a muzzle flash, and heard gunshots. The tan Lincoln then drove down the alleyway behind the house. At some point, Padilla's wife called 911.

The tan Lincoln was stopped by Sergeant Meridian approximately one block away. Defendant Donte Barnes was the sole occupant and driver of the tan Lincoln and he was placed under arrest. Defendant Alfredo Beltran-Ruiz was arrested on a probation violation at a later date. On March 20, Laura Rodriguez, defendant Enrique Gobin's mother, visited Beltran-Ruiz when he was in custody. During the visit, Rodriguez asked Beltran-Ruiz, where "it" was. Beltran-Ruiz told Rodriguez to go to defendant Humberto Ortiz' house and that "it" was under the lawnmower in the shed. (Exh. 1, statement 3). Law enforcement officers went to the location and retrieved a .22 caliber revolver under the lawnmower.

On March 25, 2011, Beltran-Ruiz was visited at the jail by an individual named Destiny. The following conversation occurred:

-5-

Beltran stated: What time Snipes have court on the 7th?

Destiny replies: What time's what.

Beltran states: What time does home boy got court on the 7th?

Destiny states: Fuck if I know. His lady called, like, oh, my God, he has court. And I'm like, all right.

Beltran states: For real. Call her and be like, oh, my God.

Destiny states: Not -- when he got locked up, she called me crying and was like why isn't Alfredo locked up, I thought they were together.

Beltran stated: Yeah, we were, but I know how to run.

(Tr., Doc. 573 at 75, 76); (Exh. 1, statement 3a).

## Statements 4a, 4b and 4c

On March 30, George Gonzalez, a high ranking member of the Surenos, was approached by Jesus Sanchez, Enrique Gobin, Alfonso Banda-Hernandez and Andrew Gusman while he was getting gas at an East Love's gas station. Defendants gave gang signs and slurs. Gonzalez left the Love's and began driving to his girlfriend's house. Gonzalez saw a Blazer and recognized Banda-Hernandez as the individual driving. A green Plymouth also began following Gonzalez. The Plymouth contained Gobin, Sanchez and an individual named Yesenia Rios. Sanchez called Banda-Hernandez on his cell phone and told him to "come where they are." (Exh. 1, statement 4a). The two vehicles followed Gonzalez around town. The driver[4] of Gonzalez' vehicle tried to speed up. At some point, Gonzalez exited the car and walked towards his girlfriend's house. Gonzalez saw the Plymouth and the individual in

---

[4] The identity of the driver was not established at the hearing.

the rear passenger seat fired shots.

Later, Yesenia Rios was interviewed and stated that Jesus Sanchez shot at Gonzalez from the back seat. At the time of the shooting, Rios was under the influence of alcohol. Banda-Hernandez was interviewed by police and stated that after the shooting, Sanchez called him by cell phone and told him to get out of the area because "it will be getting hot." (Exh. 1, statement 4c). They immediately left the area and met up at an unknown location. Sanchez told Banda-Hernandez that he shot at Gonzalez' car. (Exh. 1, statement 4b).

**Statements 5a and 5b**

On April 30, a home invasion occurred at 609 E Spruce in Dodge City. The victims, who are Guatemalan, reported that two people kicked in the door, held one victim at gunpoint and robbed him of money. A confidential witness spoke with defendant Jayson Vargas about the robbery later that day. Vargas told the witness that he and defendant Adam Flores committed a robbery. Vargas told the witness that he needed to get a new pair of shoes and gave the witness his old shoes to get rid of. (Exh. 1, statement 5a). Vargas also gave the witness money to buy the new shoes. Vargas then showed the witness the house they robbed and pointed to the window that the victim tried to climb through during the robbery. (Exh. 1, statement 5b).

**Statement 6**

On August 20, 2011, Kendra Owens and Jose Luna were driving in a vehicle and observed Jayson Vargas following them. Owens had previously had been involved in a relationship with Vargas. Vargas pulled up to their vehicle, pointed his gun and threatened Owens and

Luna.  The Dodge City police believe that Vargas is in the LCC[5] gang which is affiliated with the Nortenos.  Vargas was arrested and the firearm was found in his vehicle.

Defendant Jason Najera is a member of the DV[6] gang which is associated with the Nortenos.  At some later date in August 2011, both Najera and Luna were incarcerated at the Ford County Detention Center. Najera told Luna to tell Owens not to testify against Vargas or "bad things may happen to her."  (Tr., Doc. 574 at 35; exh. 1, statement 6).

**Statement 7**

On August 27, 2011, Jesus Torres arrived at Humberto Ortiz' home. At that time, Jason Najera, Christy Sanchez and Jose Luna were at Ortiz' home which is in the 800 block of 9th Avenue.  Jesus Torres stated that he did not like "scraps" living by his mom's house and wanted to confront them.  (Exh. 1, statement 7).  Torres asked other individuals in the home to go with him.  Luna, Torres and Najera walked to 703 9th Avenue, where an individual lived who was associated with the Surenos where a party was in progress.  After they arrived, there was a verbal altercation between the individuals at the party and Torres and Najera.  Jose Neave, Fabian Neave and Sanchez then pulled up to the house in Jose's vehicle.  Jose, Fabian, Najera and Torres got in a physical altercation with various individuals at the party and, as a result, Carlos Ramirez and Gabriel Rivera were stabbed.

---

[5] Los Carnales Chingones.

[6] Diablos Viejos.

The government seeks to introduce all 15 statements during trial. Defendants object to their introduction and assert that the statements are inadmissible hearsay.

## II. Analysis

Out-of-court statements made by coconspirators are non-hearsay and admissible evidence under Fed. R. Evid. 801(d)(2)(E).[7] <u>United States v. Owens</u>, 70 F.3d 1118, 1123 (10th Cir. 1995). "Before admitting evidence under this rule, 'The court must determine that (1) by a preponderance of the evidence,[8] a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy.'" <u>Id.</u> In determining whether Rule 801(d)(2)(E) is met, the court may rely on the coconspirator statements themselves, but the government must produce some "independent evidence" that a conspiracy exists.

The court will address each defendant's argument in turn.

### Jayson Vargas and Adam Flores (Docs. 526, 535)

Statements 5a, 5b and 6 are offered by the government against Vargas. Statements 5a and 5b are offered against Flores. Vargas and Flores argue that the statements are not admissible at trial because the confidential informant who heard the statements did not testify.

---

[7]Fed. R. Evid. 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

[8] In the present situation, preponderance of evidence is evidence sufficient to persuade the court that a fact is more likely present than not present. Tenth Circuit Pattern Criminal Federal Jury Instruction 1.05.1.

Rule 602 of the Federal Rules of Evidence states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . " These rules are relaxed during a <u>James</u> hearing; however, at trial, the testimony will need to be presented through the informant who heard the statement. The government responds that the informant will be available for trial.

Vargas and Flores further contend that the statements are not admissible as co-conspirator statements because the government has failed to establish the existence of a conspiracy. Statements 5a and 5b, however, were made by Vargas. Therefore, these statements are admissible pursuant to Fed. R. Evid. 804(b)(3) as statements against interest. However, the identification of Flores in both statements is not admissible unless the government has established that a conspiracy existed, both Vargas and Flores were members of the conspiracy and that the statements were made in furtherance of the conspiracy.

"A person is a member of a conspiracy if he was aware of the common purpose, willingly participated in the conspiracy, and intended to advance the purpose of the conspiracy." <u>United States v. Rutland</u>, 705 F.3d 1238, 1251 (10th Cir. 2013). The only evidence introduced at the hearing pertaining to Adam Flores and his involvement were the statements made by Vargas identifying Flores.[9] The evidence

---

[9] The government's exhibit states that these statements are admissible as to both the RICO conspiracy and the robbery conspiracy. Flores, however, is not charged as a co-conspirator in the RICO conspiracy. Moreover, the government has not responded to Flores' position that he is not a member of any conspiracy. The government has the burden of establishing that Flores is a conspirator and it has

surrounding the events of the actual robbery do not identify who committed the robbery. Even assuming that Flores was a member of the robbery conspiracy, the statements were clearly made after the commission of the robbery. A statement occurring after a robbery is not made in furtherance of the conspiracy because at that point the conspiracy has ended. <u>Rutland</u>, 705 F.3d at 1252-53. With respect to part of statement 5a, the directive to get rid of the shoes and buy new ones, this is an instruction and is not hearsay. <u>Id.</u> at 1253. Therefore, it is irrelevant that the statement was made after the conspiracy ended. <u>Id.</u>

The portions of statements 5a and 5b that identify Adam Flores are not admissible. Statement 5a and 5b are admissible against Vargas <u>if</u> the person to whom the statements were made testifies at trial.

The testimony at the <u>James</u> hearing was that statement 6 was made by Najera to Luna. The government's response brief, however, appears to contend that the statement was made by Najera to Owens. (Doc. 588 at 7). Neither Luna or Owens are defendants. The government must call the witness to whom the statement was made in order for it to be admissible at trial against Vargas.[10]

The government asserts that this statement is admissible against Vargas as a coconspirator statement because it was made in furtherance of the RICO conspiracy alleged in count 1.

The government recaps its evidence against Vargas as follows:

---

not met its burden.

[10] Najera pled guilty to a VICAR conspiracy count and was sentenced to 120 months imprisonment. The government has agreed that it will not call Najera at trial.

> both Jayson Vargas and Jason Najera were Nortenos gang
> members. There can be little question that it would be more
> likely true than not that Najera's threat to Owens was
> motivated in large part because Najera and Vargas were
> members of the same gang and Najera did not want Owens to
> cooperate with the police against a fellow Norteno. Whether
> or not Vargas knew about the threat is irrelevant to this
> analysis.

(Doc. 588 at 7).

Vargas argues that there is no evidence to support a finding that he is a member of the RICO conspiracy and that the statement was made in furtherance of the conspiracy. The evidence submitted at the <u>James</u> hearing establishes that Vargas is a member of the LCC gang and Najera is a member of the DV, both of which are affiliated with the Nortenos. There was also testimony pertaining to a home invasion that occurred in April 2011 and committed by Vargas. The victims of the home invasion were Guatemalan, a nationality that is targeted by the various Nortenos' gangs. The court finds that this evidence is sufficient to support a finding that both Najera and Vargas were members of the RICO conspiracy, both were willing participants, and both intended to advance its purpose which was to commit crimes.

The court must now determine if statement 6 was made in furtherance of the conspiracy. With respect to statement 6, Vargas is alleged to have pulled a gun on Owens while driving. Najera allegedly threatened Owens if she cooperated in a prosecution against Vargas. The RICO conspiracy alleged in count 1 was still ongoing at the time the threat was made. The statement benefitted the RICO conspiracy because it would prevent a member from being prosecuted. See <u>Rutland</u>, 705 F.3d at 1253 (paying someone to keep quiet about a crime is a statement in furtherance of a conspiracy); <u>United States</u>

v. Carson, 455 F.3d 336, 367 (D.C. Cir. 2006)(attempts to silence a witness is a statement in furtherance of a conspiracy). Therefore, the statement is admissible against Vargas.

**Pedro Garcia (Doc. 527) and Gonzalo Ramirez (Doc. 532)**

Statements 1a, 1b, 1c, 2a, 2b, and 2c are offered against Garcia and Ramirez as evidence for the crimes alleged in counts 1 through 9, including the RICO conspiracy in count 1, VICAR conspiracy to murder alleged in count 2 and VICAR conspiracy to commit assault alleged in count 8. Garcia spends an extended amount of time arguing that the government has not established that he is a member of the RICO conspiracy because there is not interdependence between the members. Garcia, however, cites to authority which deal with drug conspiracies to support his position. "Interdependence is an essential element of a § 371 conspiracy." 10th Cir. Criminal Pattern Jury Instructions (2011), page 107. It is not an element of a RICO conspiracy. In United States v. Harris, 695 F.3d 1125 (10th Cir. 2012), the Tenth Circuit set forth the elements for a RICO conspiracy as follows:

> First: A conspiracy or agreement, as detailed in the indictment, existed between two or more persons to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity;

> Second: that defendant deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose[;] and[ ]

> Third: the defendant agreed that someone, not necessarily the defendant, would commit at least two of the racketeering acts detailed in the indictment.

695 F.3d at 1131.

Although Garcia objects to his membership in the RICO conspiracy, he makes conflicting statements regarding his membership in the

conspiracies alleged in counts 2 and 8. The evidence presented at the hearing was that Garcia was a member of the Nortenos, he made statements 1c and 2c, and may have also made statements 1a and 2a. Those statements clearly show that there was an agreement on June 8 to "go get some scraps [Surenos gang members]" and that they did just that by shooting men they believed to be Surenos. There was also an agreement to rob a house prior to the commission of the robbery. Garcia was then involved in the robbery. The court finds that there is sufficient evidence to establish the existence of the conspiracies alleged in counts 1, 2, and 8, and Garcia's membership and participation in those conspiracies.

The court further finds that Ramirez was also a member of the conspiracies alleged in counts 1, 2, and 8. The evidence at the hearing was that Ramirez was involved in both the robbery and the shooting. Ramirez instigated the robbery by picking out the house and he was clearly pleased by the murder of Peralta as evidenced by statement 1b. Ramirez is also a documented member of the Nortenos.

### Statements 1a, 1b, and 1c

Turning to the statements, Garcia asserts that statements 1a and 2a are inadmissible because the informant is unsure of who actually made the statements, Garcia or Ramirez. The evidence was that both Garcia and Ramirez were either standing or sitting next to each other when the statements were made. The fact that the witness cannot identify the speaker goes to the weight of the evidence and not its admissibility. Garcia can cross examine the witness at trial about his or her recollection. Because both Garcia and Ramirez were members of the conspiracy, the statements would be admissible against either

-14-

or both if they were made in furtherance of the conspiracies.

Discussions of future intent "that set transactions to the conspiracy in motion" are statements made in furtherance of a conspiracy. Rutland, 705 F.3d at 1253. Statements 1a and 2a were both made in furtherance of the conspiracies as they were the formation of plans to "get some scraps" and to rob a home. Therefore, they are admissible against both Garcia and Ramirez.

Garcia argues that statement 1b is inadmissible because it was made after the conspiracy ended. The statement "you really got that one" was made in the car after they were fleeing the shooting. Although the shooting had concluded, the court does not find that the conspiracy to murder ended. The conspiracy to murder began as they left Garcia's house in a car. After the murder, they all returned to Garcia's house. The court finds that the murder conspiracy did not end until, at the earliest, the point they made it safely home to Garcia's house.

Garcia also contends that statement 1b was a narrative and therefore not made in furtherance of the conspiracy. "Statements between coconspirators which provide reassurance" and statements "explaining events of importance to the conspiracy" are made in furtherance of the conspiracy. Rutland, 705 F.3d at 1253. This was an affirmation that the goal of the conspiracy was completed. It is admissible against Garcia and Ramirez.

Statement 1c, the threat to Worthey and Wright, is admissible against both Garcia and Ramirez because it benefitted the RICO conspiracy and the murder conspiracy as it would prevent a member from being prosecuted. See Rutland, 705 F.3d at 1253 (paying someone to

keep quiet about a crime in furtherance of a conspiracy); <u>Carson</u>, 455 F.3d at 367 (D.C. Cir. 2006)(attempts to silence a witness is a statement in furtherance of a conspiracy).

### Statements 2a, 2b, 2c

Both statements 2a and 2b are clearly statements made in furtherance of the robbery conspiracy because they signify the planning of the object of the conspiracy and the decision of which house to rob. Therefore, they are both admissible against Garcia and Ramirez.

Statement 2c was made by Garcia and indicated that he wanted Wright to drive east so they would avoid police who were in the area investigating the robbery that they had committed. Garcia argues that this statement doesn't make sense and is not credible because the facts do not support that they left the commission of the crime in a car. Garcia and Ramirez allegedly walked to the house which was robbed and then returned on foot to Garcia's house. The evidence at the hearing was that statement 2c was made when they were driving to commit the murder which was discussed in statements 1a-1c. A statement occurring after a robbery is not made in furtherance of the conspiracy because at that point the conspiracy has ended. <u>Rutland</u>, 705 F.3d at 1252-53. Therefore, this statement is not admissible as evidence of the robbery conspiracy. However, the statement is admissible as evidence of the overall RICO conspiracy. <u>See</u> <u>id.</u> (in a case involving multiple conspiracies, a statement may be admissible to one or all of the alleged conspiracies). The statement is made in furtherance of the overreaching RICO conspiracy because they are attempting to avoid police detection of their crimes.

### Josh Flores (Doc. 539)[11]

Statements 2a, 2b and 2c are also offered against Josh Flores. Flores makes similar arguments that were raised by Garcia. The evidence at the <u>James</u> hearing established that Flores was at Garcia's house when the statements were made to go rob a house. Flores left with Garcia, Jesus Flores and Ramirez and walked to the victims' house. Statement 2b was then made by Ramirez to "do" a certain house. Flores entered the house with the other three defendants and robbed the victims. Flores then returned to Garcia's house on foot. Flores is a member of the Nortenos gang and is charged in the VICAR conspiracy to commit robbery but not charged in the RICO conspiracy.

The court finds that there is sufficient evidence to conclude that Flores is a member of the conspiracy to commit robbery. The court also finds that statements 2a and 2b were made in furtherance of the conspiracy as discussed <u>supra</u>.

With respect to statement 2c, this statement was made in Wright's car and Flores was not present. The statement has been found to be admissible as to the RICO conspiracy but not the VICAR conspiracy to commit robbery. Therefore, it is not admissible against Flores because the government has not attempted to establish that Flores was an uncharged member of the RICO conspiracy.

### Donte Barnes (Doc. 533) and Alfredo Beltran-Ruiz (Doc. 537)

### Statements 3 and 3a

Statements 3 and 3a concern a shooting which occurred on March 15, 2011. The government contends that these statements are

---

[11] Jesus Flores did not appear at the <u>James</u> hearing and did not object to the admission of the statements against him.

admissible as evidence of the VICAR conspiracy to murder Reyes Delira-Padilla. Barnes was arrested after the shooting about a block from the scene. Beltran-Ruiz was not arrested until a few days later. On March 20, Beltran-Ruiz told Laura Rodriguez to go get something from under a lawn mower at Humberto Ortiz' house. This statement was made while Beltran-Ruiz was incarcerated. The statement is admissible against Beltran-Ruiz because it is an instruction. See Rutland, 705 F.3d at 1253. It is not admissible against Donte Barnes.

Statement 3a, however, is quite a different matter. Even presuming that both Barnes and Beltran-Ruiz were members of the conspiracy to murder, the statement was made by Beltran-Ruiz several days after the murder and it also is hearsay within hearsay. See Fed. R. Evid. 805 ("Hearsay included within hearsay is not excluded . . . if each part of the combined statement conforms with an exception to the hearsay rule. . . .") The statement includes an individual telling Beltran-Ruiz about her conversation with an unidentified "lady." Moreover, the statement was made after the conspiracy to murder had concluded. There is no evidence that the conspiracy charged was ongoing on March 25. In fact, the indictment charges that the conspiracy occurred on March 15.

The government contends that the statement is admissible because it identifies Barnes and cites to United States v. Smith, 833 F.2d 213 (10th Cir. 1987). In Smith, the Tenth Circuit held that a statement identifying a member of conspiracy is admissible as a coconspirator statement. However, the facts in Smith are not similar. The identification of the coconspirator in Smith was made during the conspiracy, not ten days later. Smith does not stand for the

proposition that an identification of a coconspirator is admissible even if it is made after the conspiracy had concluded. Statement 3a is not admissible against either Barnes or Beltran-Ruiz.

**Alfonso Banda-Hernandez (Doc. 537), Enrique Gobin**

**and Andrew Gusman (Doc. 543)**

**Statements 4a, 4b and 4c**

Statements 4a, 4b and 4c were made by Jesus Sanchez on March 30 and were disclosed to police by Yesenia Rios who presumably will testify at trial. On March 30, Gobin and Sanchez were in one vehicle and Banda-Hernandez and Gusman were in a different vehicle. Evidence at the hearing established that all four defendants are members of the Nortenos gang. The two vehicles approached George Gonzalez, a known Surenos gang member, at a Love's gas station and gang slurs and gang hand signals were exchanged between the four defendants and Gonzalez. The two vehicles then followed Gonzalez. Sanchez, who was a passenger in Gobin's car, called Banda-Hernandez on his cell phone and told him to "come where they are." (Exh. 1, statement 4a). The two vehicles followed Gonzalez around town. Sanchez then shot at Gonzalez. Sanchez called Banda-Hernandez and told him to get out of the area because "it will be getting hot." (Exh. 1, statement 4c). Both vehicles left the area and met at a location where Sanchez told Banda-Hernandez that he shot at Gonzalez.

The court finds that a conspiracy to murder George Gonzalez existed and that all four defendants were members of that conspiracy for the following reasons: all four defendants had a heated interaction with Gonzalez prior to the shooting; Sanchez directed Banda-Hernandez on where to go in order to facilitate their objective;

the four defendants followed Gonzalez while he stopped at his girlfriend's house; Sanchez instructed Banda-Hernandez to evade police; and, Sanchez informed the group that the objective was met.

Statements 4a and 4c were made in furtherance of the conspiracy. Statement 4a was made to maintain the flow of information or set the objective of the conspiracy in motion. <u>Rutland</u>, 705 F.3d at 1253. Statement 4c was made in furtherance of the conspiracy because it was an instruction to leave the area to evade the police. Statement 4b was also made in furtherance of the conspiracy. Although the shooting had already occurred, Banda-Hernandez did not know the status of the conspiracy. Statements made between coconspirators which "inform each other of the current status of the conspiracy" are made in furtherance of the conspiracy. Therefore, statements 4a, 4b, and 4c are all admissible against Gobin, Banda-Hernandez and Gusman.

### Fabian Neave (Doc. 538) and Jose Neave

### Statement 7

Fabian Neave is charged in the RICO conspiracy count and charged in count 27 with a VICAR substantive count alleging assault with a dangerous weapon on August 27, 2011. Jose Neave is not charged in a conspiracy count but is charged in a VICAR substantive count alleging attempted murder on August 27, 2011. On that date, Jesus Torres arrived at Humberto Ortiz' home. Jesus Torres stated that he did not like "scraps" living by his mom's house and wanted to confront them. (Exh. 1, statement 7).[12] Torres asks other individuals in the home to

---

[12] This statement was made in the presence of Christy Torres who testified in front of the grand jury. Presumably, Torres will testify at trial.

go with him. Fabian and Jose are not present. Torres and others walk to a residence where an individual who was associated with the Surenos was located and an altercation ensued. Jose and Fabian then pulled up to the house in Jose's vehicle and joined in the altercation.

The government asserts that there is a conspiracy and Fabian was a member of that conspiracy.[13] The government, however, neglects to explain the conspiracy at issue here. The government also suggests that Fabian and Jose are members of the conspiracy because they magically arrive after the altercation began. There is no evidence to support that they had agreed to be a part of some unnamed conspiracy on August 27, 2011.

At this time, the court finds that the government has not established that Fabian and Jose are a part of the conspiracy which existed on August 27. Their involvement in a gang fight does not equate to membership in a conspiracy and the government has not provided any authority which would suggest otherwise. Therefore, statement 7 cannot be offered against Fabian and Jose. It can be admitted against Torres.

### Conclusion

Jayson Vargas' objections are overruled in part and sustained in part. (Doc. 526). Pedro Garcia's objections are overruled. (Doc. 527). Angel Cerda's motion is denied. (Doc. 528). Gonzalo Ramirez' objections are overruled. (Doc. 532). Donte Barnes' objections are sustained in part and overruled in part. (Doc. 533). Juan Torres' motion to join is denied as moot. (Doc. 534). Adam Flores' motion

---

[13] Jose did not file any written submissions but was present at the hearing and objected to the testimony.

is granted.  (Doc. 535).  Alfonso Banda-Hernandez' objections are overruled.  (Doc. 537).  Fabian Neave's objections are sustained.  (Doc. 538).  Josh Flores' motion to exclude is denied.  (Doc. 539).  Andrew Gusman's objections are overruled.  (Doc. 543).

IT IS SO ORDERED.

Dated this ___16th___ day of May 2013, at Wichita, Kansas.

s/ Monti Belot
Monti L. Belot
UNITED STATES DISTRICT JUDGE