**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CRIMINAL ACTION** |
| ) | |
| v. ) | No. 12-10089-01-23 |
| ) | |
| Jason Najera, Pedro Garcia, ) | |
| Gonzalo Ramirez, Russell Worthey, ) | |
| Anthony Wright, Joshua Flores, ) | |
| Jesus Flores, Angel Cerda, ) | |
| Juan Torres, Alfredo Beltran-Ruiz, ) | |
| Donte Barnes, Jesus Sanchez, ) | |
| Enrique Gobin, Alfonso ) | |
| Banda-Hernandez, Andrew Gusman, ) | |
| Eusebio Sierra-Medrano, Jayson ) | |
| Vargas, Adam Flores, Fabian Neave, ) | |
| Jesus Torres, Jose Neave, Hernan ) | |
| Quezada, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

On April 16, 17 and 18, 2013, the court held so-called Daubert hearings with respect to two officers the government has identified as expert witnesses about gang activity in Dodge City, Kansas. Defendants were present with counsel and, following the extensive direct testimony of both officers, all counsel had the opportunity to question the officers with respect to their qualifications and the substance of their anticipated testimony and opinions. Most elected not to question the officers, perhaps recognizing that they had gotten far more details from the officers' direct testimony than from any Rule 16 disclosures.[1]

---

[1] Mr. Mandelman, one of the public defenders representing Ramirez has asked the court to strike the government's Rule 16 disclosure (Doc. 297) because it does not clearly delineate the witnesses'

Following the conclusion of the three days of testimony, defense counsel were offered the additional opportunity to file objections to the officers' qualifications and opinions. The court has reviewed defendants' submissions (Docs. 608, 609, 610, 611, 612, 613, 616, 617, 618, 619, 621, 622, 623, 624, 625, 626, 626-1 and 627). The majority of the defendants simply elected to join in submissions filed by a few of their codefendants.[2]

Although the term "Daubert hearing" has become common to describe challenges to the testimony of expert witnesses, the analysis of the officers' proposed testimony more properly falls under Fed. R. Evid. 702 and 703 and applicable case law. Therefore, it is important to remember what this case is about, and not about.

On April 16, 2012, the grand jury returned an indictment against 23 defendants. The indictment alleges 38 counts, including charges of violent crimes in aid of racketeering, conspiracy and felon in possession of a firearm. The indictment alleges that defendants were in a criminal organization, the Nortenos gang, whose members engaged in narcotics distribution and acts of violence including murder and robbery. These crimes were alleged to have been committed in Dodge City, Kansas, population around 27,000. The indictment further

---

testimony (Doc. 619 at 6-7). The disclosure was filed in September 2012. Mr. Mandelman does not explain why he waited until after the Daubert hearings to move to strike the disclosure. If he believed the disclosure was inadequate (which it isn't), then it was inadequate at the time of filing, not many months later. The court notes that Mr. Mandelman was present during all three days of testimony. If there is something he still believes was not clearly delineated, he does not identify it. Ramirez's motion to strike is denied.

[2]The following motions to join are granted. (Docs. 609, 610, 611, 613, 616, 617, 618, 622, 623, 625, 626, 627).

alleges that the racketeering conspiracy began in 2008 and continued through the date of the indictment.

It is readily apparent that to a great extent, this case is about gangs, gang membership and gang activity. At least as early as United States v. Robinson, 978 F.2d 1554, 1562-64 (10th Cir. 1992), the Circuit has recognized the admissibility of gang-related evidence. Robinson was decided before Daubert but no post-Daubert Tenth Circuit case has held that expert testimony regarding gangs is inadmissible. A recent example is United States v. Roach, 582 F.3d 1192 (10th Cir. 2009). Over objection, the district judge allowed a Wichita Police Department officer to give the following testimony:

> Miller went on to give expert testimony about "the types of tools of the trade that people who are affiliated with gangs, specifically the Neighborhood Crips, carry or maintain," explaining that firearms are such a tool and are used to protect drugs and to battle with other gangs. He also testified that gang members commonly use certain slang present in the letters from Roach to Hughes, including replacing the letters "ck" with the letters "cc." Finally, he told the jury that drug dealers often use colored lights to guide their customers, and that a blue bulb in particular indicates an association with the Crips, who identify with the color blue.

Id. at 1199.

On appeal, the Circuit ruled that admission of the testimony was error, albeit harmless, but not because the detective's testimony was irrelevant. The error was the court's failure to make the requisite Rule 702 Daubert analysis and findings. The Circuit noted that "other circuits have similarly allowed expert police testimony on street gang's use of slang, signifying colors, and other indicia of membership or activity." Id. at 1207 (citations omitted).

It is reasonable to assume that most, if not all, of the

-3-

prospective jurors are not now, and have not been, gang members, and will be unfamiliar with gang activity in and around Dodge City. Proper expert testimony, including testimony by defendants' gang experts, if any, will be helpful to assist the jury to understand the evidence.

### Qualifications

The qualifications of the officers, James Nau and Shane Webb, are set forth in their resumes, attached as exhibits 1 and 2. Only three of the defendants have asserted any specific challenges to the officers' qualifications: Jason Vargas (Doc. 612), Gonzalo Ramirez (Doc. 610) and Joshua Flores (Doc. 624). It is significant that none of the challenges to the officers' qualifications is supported by reference to applicable case authority; indeed, to any case authority.

Vargas objects to the officers' qualifications because they do not have specialized education and knowledge of sociology, family studies, anthropology, art history or any of the other social sciences. Vargas does not explain why such specialized education would be necessary, for example, to explain the significance and meaning of gang colors, signs, graffiti and tattoos; how gangs in Dodge City are structured and how rival gangs interact. Vargas goes on to point out that neither officer has published any peer-reviewed articles about gangs or testified as defense experts. This may, or may not, be a persuasive basis for cross-examination at trial but it is not a basis for disqualification.

Vargas asserts that the officers lack qualifications to testify about gangs because they have not been gang members themselves. No authority is cited for this proposition, undoubtedly because there is

-4-

none.³  The illogical extension of this proposition would be that a law enforcement officer cannot qualify as an expert witness on the illegal drug trade unless he or she is a drug dealer or a drug addict.

Vargas objects that the fact that officer Webb grew up in Dodge City does not make him any more knowledgeable than any other citizen or potential juror.  This objection seems to presuppose that all potential jurors are knowledgeable about gang activity in Dodge City, an especially doubtful supposition since none of the petit jurors will be drawn from Ford County.  One might ask: who is more knowledgeable about Dodge City, someone who grew up there or someone, perhaps a defense expert, whose knowledge of criminal activity in Dodge City prior to being hired in this case came from watching reruns of Gunsmoke?

Finally, Vargas speculates that the officers have become hired experts rather than ". . . someone with independent credentials in the field of gang formation and social science."  Whether the officers will be compensated by the government can be the subject of cross-examination.  But if compensation is disqualifying, what about defense experts?  Will they be appearing pro bono?  Hardly, in view of the authorizations for payment already approved by the court.  But the bigger question is why would anyone assume that a defense expert will have "independent credentials," whatever those are?  It has been this court's experience that virtually every expert has either an agenda

---

³It is possible that one or more of the defendants may elect to use "gang experts."  If a defense expert has not been a gang member, will counsel for another defendant object on that ground?  Doubtful.

It is also possible that some of the defendants will enter into plea agreements and testify for the government.  If this happens, they will not be testifying as experts but rather as fact witnesses.

or an identifiable bias to the side on which he or she testifies. That's how they get business and that's why they're hired. The court has yet to encounter an "expert" witness who is called by one side notwithstanding having given opinions favorable to the other side of the case.

Ramirez's objections are similar. He acknowledges that while both officers have "some training" about gangs, it is not specific to the Nortenos. But again, this objection presupposes that out there somewhere is Nortenos/Dodge City-specific training that is essential to the officers' qualifications but which the officers missed. If there is, counsel has failed to identify it. We're not talking here about the qualifications of a surgeon who never took basic courses in human anatomy. Will any defense expert have specific Nortenos/Dodge City training? Doubtful, once again.

Flores objects to the officers' qualifications because neither has written or read academic articles about gangs in southwest Kansas. The officers acknowledged that they have not written any academic articles and counsel is free to cross-examine them on this topic if he believes it will be effective. But it is not disqualifying. As to not having read academic articles about Dodge City gangs, there is no evidence that there <u>are</u> any such articles.

The use of law enforcement officers as expert witnesses about criminal activity is well-recognized. The fact that the expert also may be a fact witness or that some of the testimony technically may be within Rule 701 is not disqualifying, <u>United States v. DeSoto</u>, 885 F.2d 354 (7th Cir. 1989) and <u>United States v. Caballero</u>, 277 F.3d 1235, 1247 (10th Cir. 2002) ("[b]oth Rules 701 and 702 distinguish

-6-

between expert and lay testimony, not between expert and lay witnesses . . . it is possible for the same witness to provide both lay and expert testimony in a single case.") See also United States v. Blake, No. 07-8050, 2008 WL 2610474, at *9 (10th Cir. Jul 3, 2008). An expert's testimony can embrace the ultimate issue, so long as the testimony assists, rather than supplants, the jury's judgment. United States v. Dazey, 403 F.3d 1147, 1171 (10th Cir. 2005). (This is not to imply that the court endorses such opinions – they are problematic, at best.) The keys are reliability and helpfulness to the jury and, as the cases cited in the next section demonstrate, expert testimony by law enforcement officers is routinely received as helpful to jurors who are not familiar with criminal activity.

In summary, the court finds that officers Webb and Nau are sufficiently qualified by knowledge, education, training and experience to offer expert testimony about general aspects of gang activity in and around Dodge City, Kansas, subject to the requirements discussed in the following section.

### Substance of the Testimony

Defendant Garcia's objections on the substance of the officers' opinions are adopted by many of the co-defendants so his will be examined first. (Doc. 608 at 5-6). Garcia objects that the government has not "proffered any evidence of reasoning and methodology used or applied . . ." by the officers. The court disagrees. Unlike law enforcement expert testimony which identifies the kind and purity of a controlled substance by the use of scientific tests and procedures, the methodology and reliability of an officer's testimony regarding gang activity must be evaluated by a non-

scientific approach. In other words, for example, there is no recognized scientific test to determine the meaning of gang graffiti. This is made clear in cases like United States v. Mejia, 545 F.3d 179 (2nd Cir. 2008) ("An appropriate (admissible) example of such expertise would have been an expert's explanation of how the graffiti near a body indicated that the murderer was a member of MS-13 . . .") Id. at 195. Rather, the reliability of the expert's opinion must be based on law enforcement methodology which, to a considerable extent, must turn upon the training, education and experience of the officer on that particular subject. Scientific methods are not required. See United States v. Garza, 566 F.3d 1194, 1198-99 (10th Cir. 2009). "The Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony from a gang expert, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." United States v. Thomas, No. 10-4725, 2012 WL 2951410, *5 (4th Cir. July 20, 2012)(quoting United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000)); A couple of examples are illustrative.

In its expert disclosure (Doc. 297), the government mentioned gang graffiti. It is highly unlikely that jurors will be able to decipher the meaning and significance of the graffiti displayed at the hearings. Webb and Nau's ability to interpret gang graffiti was acquired, at least in part, by conversations with individuals who may or may not be Nortenos members. (Both officers testified that they spoke frequently with gang members.) Such conversations, if directly related to jury, may be hearsay but as many defendants' submissions acknowledge, Rule 703 permits an expert's opinion to be based on

-8-

hearsay which, itself, does not need to be recited to the jury. Rather, if such hearsay is reasonably relied upon by law enforcement officers involved in investigation of gang activity (and the evidence sufficiently established that it is), then the opinion is admissible, hearsay notwithstanding.

Another example is the roles or titles of gang members ("shot callers," "foot soldiers," "pee wees"). The government's disclosure identifies roles of gang members but not specific titles. The court is satisfied that Webb and Nau can give reliable testimony on this subject. The fact that the written disclosure does not mention titles is irrelevant because the information was disclosed at the hearings.

Identification of specific defendants' roles is another matter. The court will not speculate whether proper foundation could be laid for such testimony. But neither Webb nor Nau can offer expert testimony that they learned from conversations with gang members that a particular defendant is a "shot caller" who ordered a crime. Clearly, such testimony would be offered for its truth and would violate Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The remainder of Garcia's objections can be similarly rejected. It is not necessary for the government to establish some sort of scientific methodology in order for Webb and Nau to explain such generic things as gang colors, signs and symbols, which undoubtedly are subjects with which the jurors will be unfamiliar.

Turning to Ramirez's objections, he goes on at some length to question the relevance of the officers' knowledge of gangs in California and their "link" to gangs in Dodge City. The government's

disclosure noted "subsets" of the Nortenos and this apparently morphed into substantial questioning of the officers about California gangs which, at least at the time, seemed to the court to be tangential both to the officers' qualifications and to their opinions about gang activity in Dodge City. The court allowed this sort of far-reaching line of inquiry because of the nature of the hearings. Whether any of it will be inquired into at trial, either by the government or by the defense, remains to be seen. But once again, even though not specifically disclosed, defense counsel have delved into the matter and cannot claim surprise.

Ramirez makes the obligatory <u>Crawford</u> objection, which the court has just discussed. He objects to the officers' methodology as "conclusory, ad hoc and repetitious," apparently without recognizing that his objections are no different. He asserts that Kansas' statutory definition of a gang member is of little relevance and does not mean that a defendant who meets the state definition translates to a finding that the Nortenos are an enterprise under federal law. No one says it does.[4]

---

[4] The indictment alleges in Counts 1 and 2 that the Nortenos are an "enterprise." Count 1 charges a violation of 18 U.S.C. § 1962(d) and numerous other counts charge violations of various subsections of 18 U.S.C. § 1959. The Circuit has specifically held that the existence of an enterprise is <u>not</u> an element of § 1962(d). <u>United States v. Harris</u>, 695 F.3d 1125 (10th Cir. 2012). It has also held that existence of an enterprise <u>is</u> an element of § 1959(a)(5). <u>United States v. Arrington</u>, No. 09-2151, 2010 WL 4027823 (10th Cir. Oct. 15, 2010). The content of instructions is not relevant to the present discussion but an instruction such as hypothesized by Ramirez seems unlikely.

The term "criminal street gang" is a term defined by Kansas statute, K.S.A. 22-3901(j). Thus Webb and Nau, as state law enforcement officers, were guided to some extent by a statutory framework in terms of what constitutes gang activity in Dodge City. Based in part on the statute, Webb and Nau participated in the

Flores attacks the methodology of the officers' opinions in a manner, the logic is pretty obscure:

> Thus, the government's proposed experts methodology for forming their expert opinion is to taking training about something that, may have some similarities, but cannot be said to be consistently similar over time geography, culture or group, to the subject of their proposed expertise and then render an opinion about the alleged gangs which are the subject of their proposed expertise based upon that training. In short, the government's proposed experts have studied one thing and based upon their studies rendered an opinion about something that can not be said to be consistently similar to the thing studied. They are comparing apples and oranges and rendering reaching proposed expert opinions about the oranges based upon their training relating to apples. Such a methodology cannot be said to render reliable opinions. This is especially true as the government's exhibits nor the testimony of their proposed experts reveal how the behavior, actions, language and operating procedures of the alleged gangs of Dodge City may differ from that of the gangs which were the subject of the witness' training or from the behavior, actions, language and operating procedures of the same alleged gang at a different time.

(Doc. 624 at 3).

If Flores's point is that the officers' (and particularly Webb's) training involved gangs other than the Nortenos and Surenos, it is not well-taken. No single authoritative, Dodge City/Nortenos/Surenos-study has been identified, or likely will be identified in this case. Assuming defense gang experts are identified, it seems reasonable to assume that their opinions will be based, to some extent, on gangs

---

creation of written materials, including portions of the Dodge City Police department Policy and Procedure Manual, which defines and provides general information about the Nortenos and Surenos (Gov't Exs. 1 and 2). The officers were questioned in detail about these materials. It remains to be seen whether the materials, or any portion thereof, will be offered into evidence at trials, whether by the government or defense, or both. But the court observes that if the materials did not exist, Ramirez's counsel would attack the officers' opinions as mere speculation and ipse dixit.

-11-

other than those in Dodge City. Will Flores lodge similar objectives to the methodology of defense experts? Doubtful.

The most straight-forward objection to the officers' opinions is made in a three page submission by David Rapp, counsel for Beltran-Ruiz (Doc. 626). He cites Judge Tena Campbell's decision in <u>United States v. Kamahele</u>, No. 2:08-cr-758, 2011 WL 3861576 (D. Utah Sept. 1, 2011), which does an excellent job of covering the bases for admission of expert gang evidence. Mr. Rapp's objection is that the government has failed to present sufficient methodology evidence to allow the defendants to determine which of the officers' opinions are based on independent judgment as opposed to simply repeating information provided by other officers or individuals. The court disagrees. Other than her comment that Officer Merino applied his individual judgment and "expertise derived over many years and from multiple sources" citing <u>United States v. Johnson</u>, 587 F.3d 625, 635 (4th Cir. 2009), Judge Campbell's decision does not discuss "methodology."[5] It seems reasonable to assume that she recognized that Officer Merino's methodology was derived from experience, which is very similar to how Officers Webb and Nau developed the opinions initially disclosed in writing and covered extensively at the hearings.

---

[5]In a subsequent decision, not cited by the parties but attached as Exhibit 3, Judge Campbell allowed the opinion. She precluded Officer Merino from using as the basis for his opinions ". . . any information from alleged sources of that information whose identities were not given to Defendants. Those sources include those whom Officer Merino described as "reliable source," "witnesses and victims," "church leaders," "concerned members of the community," and non-testifying "co-Defendants."" Judge Campbell ruled that if during trial, any defense counsel believes that Merino is relying on undisclosed information, counsel may object. A similar rule may, or may not, be appropriate in this case. The specific issue is not presently before the court.

## Conclusion

After performing its "gatekeeping" role, the court finds that Nau and Webb's opinions are reliable, relevant and will be helpful to the jury, assuming proper foundations are laid. Therefore, their opinions are admissible, subject to appropriate objections at trial, the substance of which cannot be determined and ruled upon at this time. Defendants' objections to Nau and Webb's testimony are overruled. (Docs. 608, 612, 619, 621[6]).

IT IS SO ORDERED.

Dated this __21st__ day of May 2013, at Wichita, Kansas.

> s/ Monti Belot
> Monti L. Belot
> UNITED STATES DISTRICT JUDGE

---

[6] Quezada's motion in limine to exclude the testimony of Nau and Webb is denied.